Home Packing Company v. Commissioner.
Home Packing Co. v. Commissioner
Docket No. 36297.
United States Tax Court
1953 Tax Ct. Memo LEXIS 70; 12 T.C.M. (CCH) 1217; T.C.M. (RIA) 53346; October 30, 1953
*70 From 1912 through the taxable years 1946, 1947, and 1948, petitioner followed a plan of keeping its fixed overhead for executive salaries low by the payment of nominal salaries plus a bonus based on a percentage of its profits. Petitioner's profits were larger than usual during those taxable years, and compensation paid to petitioner's three executive officers in those years was proportionately higher because of the standard bonus of 25 per cent of petitioner's profits for those years which was divided among them. Respondent determined that this compensation was unreasonable in amount and reduced it accordingly. Held, the compensation paid to the three executive officers was a reasonable allowance for personal services rendered. John F. Greaney, Esq., 1002 Warner Building, Washington, *71 D.C., for the petitioner. Elmer E. Lyon, Esq., for the respondent. RICE
Memorandum Findings of Fact and Opinion This proceeding involves deficiencies in income tax and excess profits tax asserted against the Home Packing Company (hereinafter referred to as petitioner) as follows: Fiscal
Year Ended
Excess
October 31
Income Tax
Profits Tax
1946
$40,191.36
$14,983.53
1947
25,398.18
1948
23,950.51
$89,540.05
$14,983.53
The issue to be determined is the reasonableness of the deductions by petitioner for the compensation of its three executive officers during the fiscal years involved. The petitioner does not contest any of the other adjustments made by the respondent in his notice of deficiency, which account for only a minor part of the deficiency. Some of the facts were stipulated. Findings of Fact The stipulated facts are so found and are incorporated herein. Petitioner is a corporation organized and existing under the laws of the State of Indiana with its principal office at First and Chestnut Streets, Terre Haute, Indiana. Its income tax returns for the taxable years here involved, petitioner's fiscal years ended October 31, 1946, October 31, 1947, and *72 October 31, 1948, were filed with the collector of internal revenue for the district of Indiana. Since its organization in 1906, petitioner has been engaged in the meat-packing business. It also operates an ice-manufacturing plant as an auxiliary venture, selling surplus ice not required for its own operations to independent distributors. During the year 1912, the petitioner entered into an agreement with one Isaac Powers whereby he was made vice-president and general manager and placed in complete charge of the affairs and operations of the company. He continued in this position, and with the same authority, until his death in October 1941. Under the initial agreement with Powers, which was for a term of 10 years, petitioner agreed to pay him $50 per week and a bonus of 50 per cent of the net earnings of the company. Subsequent contracts provided for a fixed salary plus a bonus of 33-1/3 per cent of the net yearly earnings, such earnings to be determined without deducting charges for depreciation and before payment of dividends on preferred stock. Upon the expiration of his 5-year contract in 1940, this compensation arrangement was continued on a month-to-month basis since some *73 of the stockholders were dissatisfied with it and wished to make a change. Powers was in ill health at this time and died in October 1941. On November 6, 1941, the board of directors of petitioner considered the matter of a successor in the management of the business. It decided to place such management in the control of three officers, each of whom had been with petitioner for many years and had held positions of responsibility immediately subordinate to Powers. The board of directors decided to continue its policy of maintaining a low fixed overhead for executive salaries by paying the three executive officers a nominal salary plus a bonus of 25 per cent of the profits. This bonus was to be calculated on the basis of the profits remaining before taxes but after the deduction of depreciation charges and preferred stock dividends. The following is an analysis of the compensation arrangement voted in 1941 for the three officials whose salaries are now in issue, and the number of shares of petitioner's stock owned by these three officers: Base
Share of
Shares of
Salary
25% Bonus
Stock Owned
Fred E. McFall, President
$5,200
31%
230
Robert S. Scott, Vice-President and General Manager
6,500
38%
89
John D. Royer, Treasurer
3,900
31%
15
*74 The petitioner had 1,250 shares outstanding. This compensation arrangement was renewed annually by the board of directors, through the taxable years in issue, at its meeting in June of each year; except that Robert S. Scott, the vice-president and general manager, was voted $1,300 additional per annum beginning November 1, 1942. The base salaries paid to the other two officers during subsequent years was at times less than the amounts stated above. The salary and bonus arrangement was submitted to and approved by the stockholders at their annual meetings. During the taxable years in issue, the only discussion at such meetings relative to changes in this compensation arrangement was in regard to a possible reapportionment of the share each of the three officers would receive of the 25 per cent bonus. Fred E. McFall, the president, began working for the petitioner sometime before 1920. He left petitioner for a short time to conduct his own business but later returned, becoming president some years prior to 1941. He had been in the hog-and-cattlebuying business all of his adult life, and was in charge of the procurement of hogs and cattle for petitioner. His skill and years of experience *75 enabled him to grade the hogs and livestock efficiently and accurately. Robert S. Scott, vice-president and general manager, started with the petitioner in 1922 in the Shipping Department, and worked his way up to assistant general manager and vice-president by 1935. After the death of Powers, he was promoted to the position of general manager. As such, he was in direct charge of the operations of petitioner. John D. Royer, the secretary and treasurer, had been employed by petitioner for over 45 years. He started as a bookkeeper, advancing to his present position in 1920. He was in charge of cost computation, customer credits, and the finances of the company. He also acted as purchasing agent for all supplies other than livestock. Powers had operated petitioner's business as a one-man show, giving those under him only limited authority and acted in like manner with the board of directors. For some years before his death, he made it a practice to share a part of his annual bonus with the three officials whose compensation is here in issue. After his death, each of the three officials was in complete charge of the operation of his particular phase of the business. The three acted *76 as a team on policy matters, holding weekly meetings every Saturday morning for this purpose. The final decision was in the hands of Robert S. Scott, subject to review by the board of directors. The major part of petitioner's business was the slaughtering and processing of hogs, beef cattle accounting for a relatively minor part of its business. Under the management of Powers, the major portion of petitioner's sales had been sales of dressed hogs to others who would process the hogs into the various pork products. Some processing had been started in 1932. From 1941 on, the aim of the new officers was to improve the petitioner's position as a processer, there being a greater profit in such finished pork products as lard, sausages, and bacon. Additional equipment was purchased, and the facilities of the plant were improved. The sales volume increased steadily, and a fleet of refrigerated trucks was acquired to service a territory of approximately 100 miles. Shipments were regularly made to east-coast cities and foreign countries. Petitioner's gross sales, taxable income, officer-salary payments, and dividends paid on common and preferred stock during the period from December 31, 1936, to *77 October 31, 1949, inclusive, were as follows: Year
Taxable
Salaries of
Dividends Paid
Ended
Gross Sales
Income
Three Officers
Preferred
Common
12-31-36
$,974,555.69
$ 2,358.67
$ 19,944.15
$17,500.00 $0
12-31-37
2,482,648.61
15,427.45
27,489.40
17,500.00
0
12-31-38
2,556,602.22
23,535.65
31,217.13
17,500.00
0
12-31-39
2,517,898.56
33,610.65
36,377.76
17,500.00
0
12-31-40
2,622,964.63
53,163.38
41,607.78
17,500.00
0
12-31-41
3,346,438.53
40,796.43
37,312.51
17,500.00
8,750.00
10-31-42
5,538,601.73
143,484.07
59,630.70
17,500.00
7,500.00
10-31-43
5,897,817.68
194,543.34
77,598.62
17,500.00
7,500.00
10-31-44
6,704,736.95
254,983.57
99,707.85
17,500.00
7,500.00
10-31-45
4,920,701.06
213,633.04
86,494.62
17,500.00
11,250.00
10-31-46
5,932,161.03
460,142.76
169,760.92
17,500.00
11,250.00
10-31-47
8,286,755.55
295,521.61
114,017.20
17,500.00
46,875.00
10-31-48
9,654,028.96
299,769.70
115,683.23
17,500.00
46,875.00
10-31-49
9,944,506.97
138,933.24
56,237.75
17,500.00
26,875.00
Throughout the taxable years in issue, the total number of employees of petitioner was 395 *78 to 397. During 1946, subsidies were paid to meat packers by the United States Government to enable them to maintain fixed O.P.A. prices for their products, although their costs had risen. Petitioner received $415,519.60 in subsidy payments during 1946. On July 1, 1946, price controls on petitioner's products were removed by Congress and, due to a pent-up demand, prices skyrocketed. Petitioner's profits for July and August of 1946 were $289,406.49. Price controls were reinstituted in September, although at a somewhat higher level than they had been previously. Petitioner suffered a loss of $3,660.22 for September 1946. Petitioner paid the following amounts as compensation to its three officers during its fiscal years ended October 31, 1942 through 1948, and claimed such amounts as deductions on its income tax returns *: Fiscal Year
Fred E.
Robert S.
John D.
Ended 10/31
McFall
Scott
Royer
1942
$18,850.32
$33,220.06
$17,560.32
1943
23,657.77
31,063.08
22,877.77
1944
30,511.63
39,464.59
29,731.63
1945
26,424.84
34,454.95
25,644.83
1946
52,228.09
66,084.75
51,448.08
1947
34,588.73
45,099.74
34,328.73
1948
35,105.20
45,732.83
34,845.20
*79 The Commissioner in his notice of deficiency determined that the following amounts were a reasonable allowance for compensation for services rendered by the three officials during petitioner's fiscal years ended October 31, 1946, 1947, and 1948: Fred E. McFall
$15,500
Robert S. Scott
19,500
John D. Royer
15,000
The three officers have been members of the seven-man board of directors since 1942, and their ownership of petitioner's stock during this period has remained constant at 334 shares. This was 26.7 per cent of the 1,250 shares outstanding. The balance was widely distributed among approximately 29 stockholders. In 1941, sales of petitioner's common stock were made at a price of about $50 or $55. Between 1946 and 1948, an offer was made for all or substantially all of the common stock at a price of about $500 per share. The Stadler Packing Company, Inc. (hereinafter referred to as Stadler), located at Columbus, Indiana, was engaged in the processing of hogs and cattle during the period in question. Stadler employed, during 1946, 1947, and 1948, about 125 people. The four executive officials of Stadler were brothers, each of whom owned 25 per cent of *80 Stadler's common stock. One acted as general manager, another as buyer, another as sales manager, and the other was office manager. Each devoted full time to his employment with Stadler. They had an agreement to withdraw, in addition to their basic salaries, an additional bonus of 5 per cent of the profits. However, the need for additional capital for expansion prevented their taking this bonus. The vice-president testified that if a private individual had to be hired to replace one of the brothers in his executive job, they would have to pay more than they were currently drawing as compensation. During Stadler's fiscal years ended May 31, 1947, and May 31, 1948, it had gross sales, net income, paid officers' salaries, paid dividends, and made additions to surplus as follows: Fiscal Year
Fiscal Year
Ended 5/31/47
Ended 5/31/48
Gross Sales
$5,786,802.95
$5,836,232.66
Officers' Salaries: Christian Stadler, President
$12,000.04
$12,461.58
Frederick Stadler, Exec.
Vice-Pres.
12,000.04
12,461.58
John Stadler, Vice-President
12,000.04
12,461.58
Ernest Stadler, Secy.-Treas.
12,000.04
12,461.58
Total
48,000.16
49,846.32
Dividends Paid
None
None
Additions to Surplus
93,397.41
88,469.81
Net Income
149,989.82
140,675.27
*81 The Pearl Packing Company, Inc. (hereinafter referred to as Pearl), located at Madison, Indiana, was engaged in the processing of hogs and cattle during the period in question. Pearl employed during 1946, 1947, and 1948 about 125 people. Pearl had four executive officers, two brothers and two sisters, each of whom owned 25 per cent of Pearl's common stock. One brother was the president and acted as general manager; the other brother was the vice-president and acted as sales manager and plant superintendent. The two sisters were secretary and treasurer, respectively, and performed clerical duties for the most part. They served in a stand-by capacity in the absence of the president or vice-president. All four officers devoted full time to their employment with Pearl. In addition, a man was employed on a salary basis to do the buying at the stockyards under the management of one of the brothers. In response to a question as to what would be reasonable salaries for the officers of Pearl, the president of Pearl testified: "A. Well, that would be hard for me to say, because we have always worked for ourselves all our life, and I know it's a big job, and I would say that it is worth a *82 whole lot more than what we are getting; but we have never taken it due to the fact we are contemplating on building." During Pearl's fiscal years ended October 31, 1946, 1947, and 1948, it had gross sales, net income, paid officers' salaries, paid dividends, and made additions to surplus as follows: Fiscal Year
Fiscal Year
Fiscal Year
Ended 10/31/46
Ended 10/31/47
Ended 10/31/48
Gross Sales
$2,780,367.65
$4,357,720.36
$5,232,828.18
Officers' Salaries: Robert A. Yunker, Pres.
22,297.99
23,338.00
23,338.00
Leo J. Yunker, Vice-Pres.
17,568.00
18,348.00
18,348.00
M. Y. Lotz, Treasurer
8,167.00
8,687.00
8,687.00
G. Y. Wilson, Secretary
8,167.00
8,687.00
8,687.00
Total
56,199.99
59,060.00
59,060.00
Dividends Paid
144.00
144.00
144.00
Additions to Surplus
74,433.31
118,033.85
76,592.60
Net Income
132,264.75
190,451.03
153,495.51
Total compensation paid to the executive management of the petitioner, Stadler, and Pearl bears the following relation to the net income of such concerns for the years here involved: Per Cent of
Net Income
PetitionerStadler Pearl
1946
36.9
42.5
1947
38.6
32.0
32.1
1948
38.6
35.4
38.5
*83 The compensation paid by the petitioner to Fred E. McFall, Robert S. Scott, and John D. Royer, during the taxable years in issue, was a reasonable amount for the services of said officers. Opinion RICE, Judge: Section 23 (a) (1) (A) of the Internal Revenue Code permits the deduction of "a reasonable allowance for salaries or other compensation for personal services actually rendered" as atrade or business expense. The sole question before the Court is whether the petitioner's deductions for the compensation of its three executive officers in each of its fiscal years 1946, 1947, and 1948 were reasonable in amount. There is no single criterion by which the reasonableness of compensation in any particular case can be measured, and the question is one of fact to be determined by the precise facts of each case. William S. Gray & Co. v. United States, 35 Fed. (2d) 968 (Ct. Cl., 1929). In the instant case, the petitioner has followed a contingent compensation arrangement with its management officials since 1912. Its policy has consistently been to keep its fixed overhead for management salaries at a low level and augment the compensation of its *84 executives by allowing them to share in a bonus based on a percentage of its profits. Thus, since 1941, the three executive officers of petitioner have received nominal base salaries, and have divided among themselves an annual bonus of 25 per cent of petitioner's profits for the year. The Commissioner has recognized the reasonableness of contingent compensation arrangements in his Regulations 111, Sec. 29.23(a)-6. Paragraph (2) states: "The form or method of fixing compensation is not decisive as to deductibility. While any form of contingent compensation invites scrutiny as a possible distribution of earnings of the enterprise, it does not follow that payments on a contingent basis are to be treated fundamentally on any basis different from that applying to compensation at a flat rate. Generally speaking, if contingent compensation is paid pursuant to a free bargain between the employer and the individual made before the services are rendered, not influenced by any consideration on the part of the employer other than that of securing on fair and advantageous terms the services of the individual, it should be allowed as a deduction even though in the actual working out of the *85 contract it may prove to be greater than the amount which would ordinarily be paid." The compensation arrangements which petitioner made with its three executive officers was reasonable in light of the circumstances existing at the time they were voted on by petitioner's board of directors. These three officers had been trained and developed by petitioner over a long period of years to handle positions demanding skill and responsibility. Prior to 1942, the then general manager, Powers, had seen fit to share his bonus with these three officials in order to make their employment with the petitioner worthwhile. After his death in 1941, petitioner's board of directors determined that a bonus of 25 per cent of the profits, in addition to their basic salaries, would equitably compensate these three officers. This percentage was less than that paid to Powers and was computed after deducting depreciation and preferred dividends and was, therefore, more favorable to petitioner than the Powers' contract. Undoubtedly, each could have obtained a salary far in excess of the base salary paid to him by petitioner, had he sought to sell his services elsewhere in the meat-packing industry. However, *86 this team decided to improve and expand the activities of the petitioner. That they were successful, and that both they and the petitioner benefited is shown by the rising volume of sales and profits after 1942 even after taking into consideration the war and Government controls. The profits and dividends received gave the board of directors good reason to be satisfied with the efforts of the management team which had taken over in 1941. Petitioner's stock, which had sold at $50 or $55 per share in 1941, was sought by purchasers willing to pay $500 per share in 1946 to 1948. The board of directors was satisfied with this compensation arrangement, and we can see no reason why they should have been required to change it for their taxable years 1946, 1947, or 1948. Had it wished to put these officers on a straight salary basis, it would have had to increase its fixed overhead substantially. In the light of petitioner's long history of satisfactory results from contingent compensation arrangements, we cannot say that its failure to alter this arrangement in the years in question was unreasonable. Simply because it was enjoining a period of general business prosperity, it should not be *87 required to abandon its contingent compensation arrangement and acquire a large fixed overhead. The essence of such an arrangement from the employer's standpoint is the continued maintenance of a low fixed overhead for executive salaries. From the employee's standpoint, it provides an incentive to exert a maximum of effort at all times. He, therefore, gambles that the years of prosperity will more than counterbalance the years of depression. The officers concerned were entitled to share in petitioner's good years as well as its bad ones. Petitioner's fiscal years 1946, 1947, and 1948 may have worked out more favorably than the board of directors could have foreseen, but that does not cause these contracts, entered into at arm's length, to become unreasonable. There was no certainty, at the times the contracts in issue were entered into, as to what the earnings of petitioner would be for those years. That a continuation of the incentive bonus was wise is evidenced by the fact that even during these years of booming conditions, sudden changes in the price-control structure could have drastic effects on the petitioner's earnings. Thus, in 1946, petitioner lost $3,660.22 for the month *88 of September when price controls were reinstituted after a 2-month lapse. "The reasonableness of the contract is to be viewed in the light of the circumstances that existed when it was made, * * *. It is immaterial that in the actual working out of the contract contingent compensation may prove to be greater than the amount which ordinarily would be paid." Austin v. United States, 28 Fed. (2d) 677 (C.A. 5, 1928); Thomas N. Perkins, 33 B.T.A. 606 (1935); Robert Rogers, Inc. v. United States, 93 Fed. Supp. 1014 (Ct. Cl., 1950). The respondent calls to our attention Locke Mach. Co. v. Commissioner, 168 Fed. (2d) 21 (C.A. 6, 1948), certiorari denied 335 U.S. 861 (1948), affirming our memorandum opinion [Memo. Op., Docket No. 8582, Mar. 7, 1947] [6 TCM 294,]. In that case, the taxpayer had realized unusually large profits during the year 1941 due to wartime conditions. It was held that a bonus compensation arrangement, based upon a percentage of such profits, was unreasonable during such war years even though the taxpayer had had such an arrangement since 1927. The bonus in that case was voted on by Locke's *89 board of directors on April 14, 1941, well after that year's swollen profits had started to accumulate. The directors had good reason to know by that date that no incentive was required to stimulate sales and profits during 1941; war-time conditions were in full swing; and the firm's business was already several times more than that done during the same period in the previous year. It had already received a contract for all the bicyclecoaster brakes it could manufacture, this being its principal product. In sharp contrast is the action of the petitioner's board of directors. The compensation arrangement here in issue was voted on in June in 1945, 1946, and 1947 to be effective for the fiscal year starting the following November. That the petitioner's directors could have no assurance as to how post-war conditions and controls would affect the earnings' picture 5 to 17 months in the future is illustrated by the sudden loss petitioner suffered in September 1946, when price controls were reinstituted. We are not concerned here with the possibility that petitioner's bonus plan was devised to effect a distribution of earnings. This is clearly demonstrated by the unequal distribution *90 of petitioner's stock among the three officers. The treasurer owning 15 shares of petitioner's stock received the same bonus as did the president who owned 230 shares. The evidence which the respondent has introduced as to the operations and compensation arrangement of two other meat packers does not support his contention that the compensation paid to petitioner's executive officers was unreasonable. On the contrary, this evidence supports the reasonableness of the petitioner's compensation arrangement and payments thereunder. Both companies were considerably smaller than the petitioner, employing around 125 people as compared to the petitioner's 395 employees during the years in question. Although the salaries received by the executive officers in each of these companies were smaller than the total compensation paid to each of petitioner's officers, those salaries were fixed amounts payable in bad years as well as good. Petitioner's fixed overhead for executive salaries during the years in issue did not exceed $16,380, whereas the comparable overhead of the two companies offered for our comparison was a minimum of $56,199.99 and $48,000.16, respectively. There was little need for *91 an incentive bonus plan since in both companies each of the four officers owned 25 per cent of the stock. One of the companies had voted such a plan, but had never withdrawn this additional compensation because of the need of the business for additional capital for expansion. A comparison of the ratio of executive salaries to net earnings reveals no substantial difference between the petitioner's results and those of the other two meat packers. In any event, each of the officials testifying for his respective company stated that if members of the present ownermanagement had to be replaced, a greater amount would have to be paid as compensation. We find, therefore, that the salaries paid by the petitioner to its three executive officers were reasonable and the full amount thereof a proper trade or business deduction. Decision will be entered under Rule 50.